## BENHAM et al. v. UNITED STATES.

(Circuit Court of Appeals, Sixth Circuit. July 15, 1925.)

No. 4262.

1. **Indictment and information ⟨⟩71—Indictment held not vague and uncertain.**

Indictment, under Criminal Code, § 215 (Comp. St. § 10385), for use of mails in scheme to defraud, *held* not subject to demurrer and motion to quash for vagueness and uncertainty.

2. **Indictment and information ⟨⟩71—Allegations of indictment held too vague and uncertain to support conviction.**

In prosecution under Criminal Code, § 215 (Comp. St. § 10385), for use of mails in scheme to defraud, allegations in first two subdivisions of indictment charging fraudulent representations as to value of stocks, their stability, safety, and soundness, ordinarily matters of opinion, and representations as to preferred stock guaranty, which was a feature of each corporate charter involved, *held* too vague and indefinite, when considered alone, to support conviction.

3. **Corporations ⟨⟩529—Payment of dividends out of capital stock is no crime under Ohio law.**

Mere payment of dividends out of capital of a corporation is no crime under Ohio law.

4. **Post office ⟨⟩49—Income tax letter held irrelevant.**

Where indictment, under Criminal Code, § 215 (Comp. St. § 10385), for use of mails to defraud, did not charge any misrepresentation as to the value of common stock of corporations for years 1911–1919, letter bearing on value that defendants placed on common stock for such years was irrelevant.

5. **Criminal law ⟨⟩858(3)—Exhibits should be sent to jury in form offered, unless both sides consent to sealing unread parts.**

While matter of sending exhibits to jury is within trial judge's discretion, they should be sent only in form offered in evidence, unless both sides consent to sealing unread parts.

6. **Post office ⟨⟩49—Proof of oral misrepresentations properly received.**

In prosecution, under Criminal Code, § 215 (Comp. St. § 10385), for use of mails to defraud, inasmuch as indictment charged misrepresentations, both oral and printed, proof of oral misrepresentations by defendants, or by their agents, if authorized by them, though made out of their presence, was properly received.

In Error to the District Court of the United States for the Eastern Division of the Southern District of Ohio; John E. Sater, Judge.

William G. Benham and another were convicted of use of the mails in a scheme to defraud, and they bring error. Reversed and remanded.

Smith W. Bennett, of Columbus, Ohio, and Robert R. Nevin, of Dayton, Ohio, for plaintiffs in error.

Benson W. Hough, U. S. Atty., and Dana F. Reynolds, Asst. U. S. Atty., both of Columbus, Ohio (Haveth E. Mau and William B. Bartels, Asst. U. S. Attys., both of Columbus, Ohio, on the brief), for the United States.

Before DENISON, MACK, and KNAPPEN, Circuit Judges.

MACK, Circuit Judge. On November 9, 1923, an indictment in 12 counts, under section 215 of the Criminal Code (Comp. St. § 10385), charging the use of the mails in a scheme to defraud, was returned against the defendants. Each count was predicated upon the sending of a specific letter. Motions to quash and demurrers were successively filed and overruled. The trial began January 14, 1924, and ended March 1, 1924; during its progress the twelfth count was nolled on application of the government. The jury returned a verdict on the remaining 11 counts. After motions for new trial and in arrest of judgment were overruled, sentence was imposed on each defendant cumulative as to several sets of counts, aggregating 20 years' imprisonment and $5,000 fine.

We adopt the summary of the indictment as given in the court's charge substantially as in the appendix hereto.

[1] 1. The demurrers and the motions to quash and in arrest of judgment were properly overruled. Regardless of any vagueness in the introductory portions of the indictment and in subdivision (a), matters that will be hereafter considered, the misrepresentations, falsity, and fraudulent intent involved in the scheme are clearly charged in subdivisions (b) and (c) as to each of two of the subsidiary companies. That, with the other relevant allegations essential to the statutory offense, suffices to save the entire indictment from the charge of vagueness and uncertainty.

[2] 2. While the alleged frauds in respect to the several companies might have been charged in separate counts or in separate indictments consolidated for trial, as separate schemes, that course was not pursued; each of the 11 counts charges the identical scheme with identical allegations in respect thereto. If, nevertheless, it could be said, as in our judgment it cannot, that the verdict was necessarily based upon a finding against the defendants on the charges in

subdivisions (b) or (c), or that in respect to those specific charges the jury, under the evidence, could have reached no conclusion other than that announced by it, it would be unnecessary to consider certain alleged errors in the trial.

But, if the allegations of the introductory portions and of subdivision (a), standing alone, must be deemed too vague to support a conviction, and if the court held them sufficiently specific for that purpose, or misinterpreted their meaning to defendants' detriment, then, inasmuch as, under the evidence introduced over objection in support thereof and under the charge, the jury might well have based their verdict thereon, regardless of subdivisions (b) or (c), the judgment of conviction would have to be reversed, and a new trial ordered. A consideration of those parts of the indictment, their alleged vagueness and interpretation, leads, in our judgment, to this conclusion.

Manifestly and confessedly the form of the indictment was a source of difficulty and embarrassment throughout the trial. At one time, about halfway through the case, the trial judge stated:

"When the indictment was before me on a motion to quash and demur it was not argued orally, and there is where a mistake was made. I would have understood it better, when we entered into the trial, had oral arguments been made. I examined it far enough to satisfy myself that it charges an offense, and beyond that I did not go. In the earlier stages of this case I was impressed with the contention of the defendants that the indictment is a narrow one—much more narrow than I have concluded. That is due to the unusual form of the indictment. The books are full of cases which set forth indictments, there being no very great dissimilarity in their general form; but this one is out of the usual form, and that makes rulings more difficult."

Just before this the court gave an interpretation to the indictment in these words:

"This indictment does not limit the government to evidence on the Phœnix-Portland Cement Company, the International Note & Mortgage Company, and the Dollings Company, and a fair interpretation of it, notwithstanding the matter quoted in certain paragraphs marked (a), (b), and (c), the indictment is so drawn that that is only in addition to what appears as having been represented by word of mouth, and by circulars, pamphlets, and the like of that; and the indictment on its face, when properly analyzed, is not restricted to those three companies at all. I have said all the while, on different occasions, that the ruling ultimately to be made will depend upon the—at least I have clearly intimated—will depend upon the stocks that were sold of the different companies within the three years preceding the filing of the indictment, and I have been assured all the while that evidence of that kind will be produced. It ought to have been in early in the case, so that rulings could have been made all the way through, which would not need any change. But I do not think that this indictment bears any such narrow construction as the defense seek to put upon it, and whenever that evidence is offered, I will take the matter up and dispose of it finally."

While the broad interpretation given to it by the trial judge may well be that actually intended by the draftsman and supported by the underlying facts of the case, we are unable, upon a careful study, to find that the allegations set forth therein are sufficient to justify that interpretation.

Apart from the facts set out in subdivisions (a), (b), and (c), we think it clear that the indictment would be too vague and indefinite to stand. "The stability, safety, and soundness" of stocks would ordinarily be very largely a matter of opinion. While it is alleged that false and fraudulent representations were made in respect thereto, nowhere, apart from subdivisions (a), (b), and (c), is it pointed out wherein the stocks were not stable, safe and sound. Each of subdivisions (b) and (c) refers to a specific corporation. Furthermore, the subspecification, under (a), that the companies were insolvent continuously from January 1, 1921, to November 9, 1923, if construed to mean that all the companies named were insolvent during that entire period, is far too general as a basis for proof that some one or more of them was at some time within that period insolvent. Some of them were not even in existence on January 1, 1921. Such an allegation fails fairly to inform the defendants of the specific charges against them, and cannot, therefore, be approved or sustained.

Under the court's construction the jury might well have found fraud in the method pursued by defendants in carrying out the original nonfraudulent Dollings plan, entirely apart from the charges in subdivisions (a), (b), and (c). But, while an indictment doubtless could have been drawn detailing with particularity a fraudulent scheme in carrying out the general Dollings plan during the three-year period, the vague

and ambiguous references thereto in the present indictment are clearly insufficient for such purpose.

Subdivision (a) charges that the defendants fraudulently represented that the Dollings companies had charter provisions which had in the past established, and would in the future establish, a preferred stock dividend guaranty fund, and would thereby at all times insure payment of 7 per cent. per annum on the preferred stock. A careful reading of the subdivision does not make it clear that the pleader was charging anything more than that the defendants fraudulently represented that these charter provisions, which were quoted, existed; and there was no proof offered that they did not exist. If it was intended thereby to charge that defendants falsely and fraudulently represented that such funds had actually been accumulated as to any or all of the 11 companies, then this subdivision of the indictment, apart from some vague intimations, utterly fails to set forth facts justifying any such inference. The alleged representations that these charter provisions insured the payment of preferred dividends cannot be taken as meaning more than that the payments were insured in the manner and to the extent shown by the provisions which were relied upon. If more was meant, certainly that meaning could and should have been clearly expressed. If it was intended to charge that such provisions were devised, or, as the government in the course of the trial contended, were widely advertised, by defendants, for the fraudulent purpose of inducing ignorant buyers erroneously to believe that they did more than they purported to do, and that by their very existence they in some manner necessarily insured the payment of dividends even though no profits were made, certainly that fraudulent purpose and defendants' knowledge of the falsity of such a representation could and should not have been left to uncertain inference.

[3] The concluding paragraph of subdivision (a) alleges that no preferred stock dividend guaranty fund was ever set aside or established, and, on the contrary, dividends were paid out of capital, contrary to the law. Obviously such funds could not be established, if there were no profits. The payment of dividends out of capital may have been contrary to civil law, and may have resulted in a liability as against creditors, but as to stockholders it was not necessarily fraudulent. If it were intended to charge a scheme to defraud by obtaining

7 F.(2d)—18

subscriptions upon false and fraudulent representations, express or implied, that such dividend fund had been established out of profits, and that the dividends were paid therefrom, or merely that the dividends were paid out of profits, the allegations of the indictment are obviously insufficient to express the draftsman's intent. The fact that each count charged the mailing of a letter with a dividend check might lead to the surmise that such was actually the intent of the draftsman. But such a surmise is insufficient to justify reading into a criminal indictment charges that are not expressed therein. The trial judge, moreover, did not make it clear to the jury that the mere payment of dividends out of capital was no crime under Ohio law.

3. In view of the conclusion reached, that the judgment must be reversed and a new trial granted, it will not be necessary to consider many alleged errors. We touch upon some of them as a guide to further proceedings under this indictment, or under such superseding shorter and clearer indictment as may perhaps be filed within the statutory period.

In our judgment there is nothing in the comments of the trial judge during the progress of the trial that was unfair or prejudicial to the defendants.

[4] Irrespective of any "interest" of the government in an income tax letter bearing upon the value that defendants placed upon the common stock of the Dollings companies for the years 1911–1919, or upon the nonprejudicial effect of its admission in evidence, we fail to see its relevancy, as the indictment does not charge any misrepresentation as to the value of such common stock.

[5] Complaint is made that certain government exhibits, which had been offered in evidence, but not read in their entirety, were sealed up as to the parts not read, and in this form, over defendants' objection, were sent to the jury room. While the matter of sending exhibits to the jury is largely within the discretion of the trial judge, we think it the proper practice to send them only in the form in which they were offered in evidence, unless both sides consent to sealing the unread parts. The government should not have offered the entire documents, if parts thereof were deemed irrelevant.

[6] Inasmuch as the indictment charges that the misrepresentations were both oral and printed, proof of oral misrepresentations, either by or authorized by defendants,

was properly received. If defendants, directly controlling and managing the Dollings Company and its subsidiaries, expressly or impliedly instructed or authorized the salesmen of these companies to make representations, proof of oral statements by such company salesmen, though out of the presence of, but pursuant to such instructions or authorization of, defendants, was clearly admissible against them.

Whether or not the alleged scheme to defraud was devised on or before January 1, 1921, as alleged, is immaterial; it suffices to prove, as to such a scheme, just as it does in a conspiracy charge, that, whether devised then or later, it was in force at the time that the mails are charged to have been used pursuant thereto.

Reversed and remanded.

### Appendix.

The indictment charges that at and prior to January 1, 1921, the defendants devised and intended to devise a scheme and artifice to defraud the 11 persons named in the first 11 counts of the indictment, and also the public generally, including many thousand others, in addition to the 11 persons specifically named; that such scheme and artifice continued down to November 3, 1923, and was intended to obtain money and property by means of false and fraudulent pretenses, representations and promises; that Benham was president and treasurer of the R. L. Dollings Company, an Ohio corporation, and Harrison was its vice president, secretary, and counsel.

It further alleged that the defendants obtained the control of such Dollings Company, and, by virtue of the power thus acquired and the official positions held by them, controlled, supervised, managed, and directed that company's operations and policies; that the business of such company was, among other things, to convert firms, individuals, or existing corporations, into corporations, to acquire stocks and bonds, to financially aid and assist in capitalizing and recapitalizing such corporations, to sell stocks, especially preferred stocks, of such Dollings Company, and of concerns converted into corporations, and, to carry out their purpose, to organize, reorganize, capitalize, and recapitalize, and financially aid and assist, the corporations thus formed, or cause the same to be done, and to issue or cause to be issued by such corporations large amounts of stock, particularly preferred stocks; and that defendants advertised and sold the stocks of said corporations to the public generally and to the 11 persons specifically named in the first 11 counts of the indictment.

Of the corporations named, whose stocks were sold, 13 were therein named. It was alleged that the defendants, by virtue of their official positions in the Dollings Company and of their control of it, through a large sales agency formed and conducted by them, by word of mouth instructions, by advertisements, circulars, books of instruction, leaflets, pamphlets, booklets, and letter, effected—as a part of their scheme to defraud by false pretenses, representations, and promises—sales of stock, and received therefor millions of dollars and other property equivalent to money; that the printed and typewritten advertising matter above mentioned was prepared or caused to be prepared by the defendants, and was circulated and distributed by the defendants to the persons named in the indictment and the public generally through the United States mails or post office establishments, and was physically distributed by the defendants' agents and employés through the said Dollings Company. It was further charged that, to further such scheme and artifice to defraud, the statements circulated by word of mouth and the representations contained in the printed and typewritten matter distributed, wherein and whereby it was represented by defendants that the preferred stocks of the Dollings Company and its subsidiaries or industries were stable, safe, and sound, were false, fraudulent, and untrue, and that such statements and representations so circulated and distributed were made and circulated by defendants, or under their instructions by their agents and employés, for the express purpose and with the intent of obtaining money and property of the 11 persons named in the indictment, and the public generally, by false and fraudulent pretenses, representations, and promises.

The indictment further alleged that, as a part of their scheme and artifice to defraud, in order to obtain money by means of false and fraudulent pretenses, representations, and promises, the defendants, from January 1, 1921, to November 9, 1923, through their said advertisements represented to such eleven persons and the general public the following, to wit:

(a) That, under the charter provisions of the various corporations organized by the Dollings Company of Ohio, there had been established in the past, and would in the

future be established, a preferred stock dividend guaranty fund, which at all times would insure the payment and return of 7 per cent. per annum or more on outstanding stock of such industries or subsidiaries, and in connection with such advertisements and representations the defendants published and distributed a pamphlet, known as Benham's "Annual Report," as president, to the stockholders of the R. L. Dollings Company, dated February 7, 1922, in which, over his signature, he, among other things, said:

"This review of operations of the R. L. Dollings Company for the year 1921 covers a period of time during which great and serious problems confronted the business world of America. * * * I wish to call attention to the manner in which Mr. Harrison has prepared the charter provisions relating to the preferred stock sold to the customers of the R. L. Dollings Company. No protective or safety provision that can be thought of has been omitted in preparing these charter provisions, and the safety which is insured to the preferred stockholders can be judged when I tell you that, in thus making all of the provisions of the preferred stock a matter of the charter issued by the state under which the corporation is chartered, it precludes the possibility of any of these provisions ever being changed by action of a board of directors through any power conferred upon them by a set of by-laws. Thus the original contract of the preferred stockholder with the corporation whose stock he owns remains inviolate, and can never be changed without his consent.

"I especially wish to call your attention to one safety provision which occurs in the charters of our industries, and which is the most prominent at the present moment. I refer to the provision for a preferred stock dividend guaranty fund, which I quote: 'The corporation shall create and maintain a fund for the payment of dividends on the preferred stock in any year or years in which the earnings of the corporation are not sufficient to pay the preferred stock dividend charges, said fund to be known and designated as the preferred stock dividend guaranty fund, and on each semiannual dividend date the corporation shall set aside to the credit of such fund all of its surplus profits for the preceding fiscal six months remaining after the payment of 7 per cent. cumulative dividends on the preferred stock, and after adequate depreciation charges have been made or provided for,

until the amount to the credit of said fund is sufficient to pay four semiannual dividends upon the greatest amount of preferred stock that has been at any time outstanding.' In this way surpluses are built up, so that in the lean years dividend payments can be made without interruption from surpluses created for this purpose during the prosperous years."

The indictment then charged that the charter provisions relating to the preferred stock sold to the customers of the Dollings Company, and the representations so made through the advertisements in the pamphlets mentioned in the indictment, were made by defendants for the express purpose and with the intent of inducing the customers of said Dollings Company, the 11 persons named in the indictment and the public generally, to believe that, on account of such charter provisions, the preferred stock dividend guaranty fund had been established, which would insure to purchasers of preferred stock the payment of stock dividends and the safety of investments made by them, which representations, made for the purpose and with the intent just mentioned, were, it was charged, false and untrue, and were known by Benham and Harrison, and each of them, when made, to be false, fraudulent, and untrue. The corporations concerning which such representations were made were continuously from January 1, 1921, to November 9, 1923, insolvent, it was charged, which corporations, 11 in number, included all the corporations previously mentioned, except 2. The indictment then alleged that no preferred stock dividend guaranty fund was ever set aside or established, but, on the contrary, dividends that were paid were not paid out of surplus profits, but from other sources, and were received from the sale of stock of said corporations, in violation of law, and especially in violation of the Ohio statutes.

Under a further subdivision, designated (b), the indictment further charged that the defendants, as a part of their scheme and artifice to defraud, further represented, through their various forms of advertisements, that the International Note & Mortgage Company was a sound and profitable concern, and its preferred stock a sound, profitable, and permanent investment. Descriptive of such representations concerning the same are, among others, first, the representations found on certain pages of the pamphlet known as "An Opportunity Realized," as follows:

"Dollings' Entry into Financial Fields.

"The customers and friends of the R. L. Dollings Company are already aware of the service which this company has been rendering to those who have intrusted their money to it for investment. The rapid growth and increased strength of the R. L, Dollings Company has made it necessary for its executives and the experts of the service department to become close students of the safe and profitable investment of money.

"An investigation has let them into a wide and varied field for that which would enable them to offer to our customers the sort of an opportunity which they could thoroughly approve. The conclusion reached, after a most painstaking investigation, resulted in the determination to form a financial institution to deal in money and credits, with broad enough powers and a sufficiently large capital to take advantage of the business which comes to institutions of this character. Hence there was incorporated under the laws of the state of Ohio, on June 4, 1921, the International Note & Mortgage Company.

"Dollings Standard Charter Provisions.

"The charter as granted by the state of Ohio is one of the usual Dollings charters, carrying with it every safeguard that human ingenuity can devise for the protection of the stockholders. More fortunate still is the further safeguard in the fact that the service department of the R. L. Dollings Companies has complete supervision of all its activities. The International Note & Mortgage Company engages in the purchase and sale of mortgages and mortgage notes, bonds, commercial paper, commercial accounts receivable, trade acceptances, drafts, notes receivable, certificates of deposit, bills of exchange, warehouse receipts, and such other evidence of credit as in the judgment of its officials are deemed safe and profitable. The dividend returns provided for on the preferred stock of the International Note & Mortgage Company are worthy of explanation, and, in order that they may be better understood, we are setting out here section 1 of the charter provisions relating to preferred stock dividends. [Then follows a quotation from said section 1.] * * *

"This company being a going concern, and on a profitable basis, and under the permanent supervision of the Dollings Service Department, the R. L. Dollings Company now offers for sale the unsold portion (which is limited) of this preferred stock, and recommends the same as a sound and safe investment."

From Benham's "Annual Report," the following was set out in the indictment:

"On July 1st the preferred stock of the International Note & Mortgage Company was announced. The great possibilities open to a financial company, whose charter was broad enough to enable them to successfully handle a character of business not permitted under banking or trust company laws, has been quite apparent for several years. Many large companies in New York and the East have been formed to handle commercial papers, mortgage paper of various kinds, and other forms of investment not possible to be handled by existing institutions. There is an unlimited field of great profit for a company of this character, as has been thoroughly demonstrated by the experience of already existing corporations. The service department of the R. L. Dollings Company had this matter under consideration for more than a year, determining at last to release this security for sale by the sales department of the Dollings Company.

"The success of the International Note & Mortgage Company has been instantaneous, and there is no question but what it has proven a source of very profitable investment for the money of the clients of the R. L. Dollings Company. The earnings on the preferred stock of the International Note & Mortgage Company were such that, at the end of the first quarter, the dividend had not only been earned for the quarter, but enough money had been earned to pay them for a long time in advance, and at the end of the second quarter this story was repeated, with largely increased earnings, and there were undivided profits of a large amount remaining after all dividends had been paid.

"The history of this corporation has been one of complete success, and will be one of the biggest achievements of the future for the R. L. Dollings Companies."

The indictment then charged that the representations so made by defendants were not only false, fraudulent, and untrue, but that defendants and each of them knew them to be so when made, and that defendants made such representations for the purpose and with the intent of inducing the 11 persons named in the counts and the public generally to purchase preferred stock of the International Note & Mortgage Company, and, after purchasing, to recommend the stock

to others, when the company was unsound, never earned dividends on its outstanding stock, never had any valuable assets to justify the payment of dividends, never made any surplus profits, and never established a surplus profit or guaranty fund, and when the preferred stock of the company sold and outstanding was worthless for the following reasons:

The capital stock of the company it was charged was $10,000,000, of which more than $8,000,000 was sold and issued by defendants. The business of the company was confined to dealings with the Dollings Company and the subsidiaries or industries it fostered, and of that business $5,000,000 were pretended to be loaned to such industries, which loans were effected by defendants making a book transfer of the indebtedness of such industries to the Dollings Company from the books of the Dollings Company to the books of the International Note & Mortgage Company's stock, and gave in exchange therefor past-due, unsecured, unsound, and worthless accounts of the industries owing to the Dollings Company.

The indictment then charges, under a subdivision designated (c), that the defendants, as a part of their scheme and artifice to defraud, in order to obtain money, as charged in the indictment, represented through the various forms of advertisements employed by them, that the Phœnix-Portland Cement Company was a sound and profitable concern, and its stock a sound, profitable, permanent investment to the owners thereof. Descriptive of the representations made about the same, among others, are, first, the statements and representations made in the printed pamphlet entitled "Cement," prepared and circulated by defendants, as follows:

"The Phœnix-Portland Cement Company; general offices, Columbus, Ohio. This company, which the R. L. Dollings Company is to expand, has a large plant at Nazareth, Pa., which is now producing a million barrels of cement a year. For the past 22 years the company has manufactured and marketed a very high grade product, which has been used in many important construction projects throughout the United States. Phœnix-Portland cement enjoys a splendid reputation, and is specified by numbers of architects and contractors. On August 28th the company started work on a new plant in Birmingham, Ala. When this is completed, it will be the largest plant in the South, and the most modern, efficient plant in the country. It is expected that this plant will be in operation in May, 1923. Additional plants are to be erected or acquired in other sections of the country.

"Recommendations of the Dollings Service Department: The Service Department of the R. L. Dollings Company, with its usual care, has examined the business of the Phœnix-Portland Cement Company from every angle. It was first attracted to this business because of the fact that the present production of cement in the United balances the demand, with no reserve capacity to take care of constantly increasing demand. This means that production must immediately be increased, and the R. L. Dollings Company feels that the Phœnix-Portland Cement Company is favorably situated to be the first in the field in increasing its capacity. Therefore, after a complete and exhaustive examination of conditions in the cement industry, of the plant, management, and accounts of the Phœnix-Portland Cement Company, the Service Department of the R. L. Dollings Company recommends the 7 per cent. cumulative participating preferred stock of the Phœnix-Portland Cement Company as a safe and profitable investment. The rights of all preferred stockholders will be safeguarded by the standard charter provisions used in the financing of all Dollings industries."

There were set out other quotations from other instruments, one of which is: "The Phœnix-Portland Cement Company has sold the capacity of its plants for months ahead, and the new plant at Birmingham will be manufacturing and shipping cement in May, right on schedule time, and just as they promised their stockholders."

And another quotation is set out in the indictment as follows: "At our Nazareth plant we have contracts on hand for about half of our yearly capacity at very attractive prices, and are reserving the other half to take care of our current dealer's business. Our Birmingham plant will be in operation in May, and we already have ample contracts and orders in sight to insure capacity operation from the start."

It was then averred that all such representations, so made, were false, fraudulent, and untrue, and were well known to be so by the defendants, when made, and were made by them for the purpose and with the intent of inducing the 11 persons named in the counts and the public generally to buy the stock of such company, and, after purchasing it, to recommend it to others, when

in fact the company was unsound and insolvent, and had never earned a dividend on its outstanding stock, and had never established a preferred stock guaranty fund, had never had valuable assets to justify the payment of a dividend, and when its preferred stock sold and outstanding was unsound and worthless, for the following reasons:

Neither the Dollings Company of Ohio, nor the Phœnix-Portland Cement Company of Ohio, ever owned, possessed or controlled Phœnix-Portland Cement Company of Pennsylvania, known as the Nazareth plant. The Ohio Phœnix-Portland Cement Company and its stockholders own no valuable right or title to the cement plant at Birmingham, Ala. The only physical, visible, and valuable assets existing which the stockholders of the Ohio Phœnix-Portland Cement Company have is a title to the plant at Birmingham, Ala., subject to 50 years' use thereof by the Pennsylvania or Nazareth Phœnix-Portland Cement Company, and a specified royalty to be paid for each barrel of cement manufactured by the Pennsylvania or Nazareth Phœnix-Portland Cement Company, which royalty is wholly insufficient to create a preferred stock guaranty dividend fund and to pay 7 per cent. per annum dividend on the preferred stock of such Ohio Phœnix-Portland Cement Company.

The indictment then charged that the defendants, knowing, at all times mentioned in the indictment, that their scheme and artifice was for the purpose of defrauding, after devising and intending to devise the same, in executing it, on or about December 31, 1921, at Columbus, Ohio, unlawfully, knowingly, willfully and feloniously placed and caused to be placed in the post office of the United States, at Columbus, Ohio, a letter, a copy of which was set forth in the first count, which letter inclosed a check for the payment of the dividend due upon shares of the preferred stock of the International Note & Mortgage Company of Ohio, standing in the name of Mrs. Mayme R. Lytle on the stockbook of such company, which letter and check were inclosed in an envelope addressed to the said Mayme R. Lytle, which envelope bore an uncanceled two-cent postage stamp and with its contents so placed and caused to be placed in the post office was carried through the mails and delivered to the said Mayme R. Lytle at Bloomville, Ohio.

Each of the remaining 10 counts of the indictment was the same as the first count, excepting that the letter and the inclosure therein alleged to have been deposited by the defendants, or caused by them to be deposited, duly stamped, in the mails at the Columbus post office, and to have been transported through the United States mails to the addresses, was a different letter from that named in the first count, and was addressed to a person other than the said Mayme R. Lytle.